## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GEOFFREY HANSEN, *et al.*,

         *Plaintiffs*,

    v.

         No. 22-cv-477 (DLF)

ISLAMIC REPUBLIC OF IRAN, *et al.*,

         *Defendants*.

## MEMORANDUM OPINION

U.S. servicemembers, government employees, contractors, and their families brought this action under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(c), against Iran and the Islamic Revolutionary Guard Corps ("Iran") for the January 8, 2020 missile attack on the al-Asad airbase in Iraq. As a result of the attack, the plaintiffs suffered serious injuries, and tragically, one servicemember took his own life. Because the attack does not qualify as an "extrajudicial killing" nor as "aircraft sabotage" under the "state-sponsor-of-terrorism exception" of the FSIA, 28 U.S.C. § 1605A, Iran is immune from suit. Accordingly, the Court must deny the plaintiffs' Motion for Entry of Default Judgment, Dkt. 20, for lack of subject-matter jurisdiction.

## I.    BACKGROUND[1]

On January 3, 2020, the United States launched a drone strike near the Baghdad International Airport that killed Major General Qassem Soleimani, a senior Iranian military

---

[1] The Court's factual findings are drawn from the plaintiffs' declarations and reports submitted in support of their motion for default judgment. *See Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 212 (D.D.C. 2012) ("In FSIA default judgment proceedings, the plaintiff may establish proof by affidavit."). The Court granted the plaintiffs' Renewed Motion for Leave to File Documents Under Seal, Dkt. 23, and will cite only to the publicly available redacted record.

official.  *See* Expert Report of Robert Greenway at 9 ("Greenway Report"), Dkt. 20-1.[2]  Following

the attack, Iran's Supreme Leader Ayatollah Khamenei "promised to exact harsh revenge."  *Id.* at

10 (cleaned up).  The promised retaliation came five days later.  In the early hours of January 8,

2020, the Islamic Revolutionary Guard Corps ("IRGC"), a branch of the Iranian armed forces,

fired at least eleven ballistic missiles at the Ayn al-Asad airbase.  *See* Press Brief by Sec'y Esper

and Gen. Milley at 2, Dkt. 20-2; Mot. for Default J. at 1, Dkt. 20.  The IRGC also fired another

missile that hit Erbil International Airport, approximately 253 miles away from al-Asad airbase.

*See id.*; Pls.' Suppl. Mem. in Supp. of Mot. for Default J. ("Pls.' Suppl. Mem.") at 3, Dkt. 21-1.

The al-Asad airbase housed numerous U.S. servicemembers, employees, and contractors.

During the attack, some U.S. servicemembers took cover in indirect fire shelters ("IDFs") while

others continued to pilot drones from a ground control station ("GCS").  *See, e.g.*, Decl. of Toni

Alexander ¶ 2, Dkt. 22-4; Decl. of Shanerria Barber ¶ 3, Dkt. 22-4.  One servicemember who took

refuge in an IDF describes how the "powerful" impact of the missiles "shook the ground beneath"

him and "tossed" him "around like a rag doll."  Decl. of Jeremy Winkler ¶ 4, Dkt. 22-2.  Another

explains how the missiles "turned the whole sky red" and how "fires broke out" on the base as

"3,000 pounds of warhead" rained down.  Decl. of Brittany Norfleet ¶ 4, Dkt. 22-1.  The blast

waves were "so strong that [the] whole [IDF] shelter shifted" and "crack[ed]."  Decl. of Andrew

Jenkins ¶ 5, Dkt. 22-1.  Servicemembers "tried to fit as many people as possible into the remaining

IDF shelters, but they "were packed so tightly that many of [them] could only get partially inside."

---

[2] Mr. Greenway, an "adjunct fellow at [the] Hudson Institute," Greenway Report at 1, prepared
his report after "review[ing] materials and documents related to this case," *id.* at 3.  He
previously "served as a senior intelligence officer at the Defense Intelligence Agency, and [he is]
a combat veteran of the Army Special Forces."  *See id.* at 2.  He was also a senior director of the
National Security Council's Middle Eastern and North African affairs directorate and "a
principal architect of the Abraham Accords."  *Id.*

Decl. of Thomas Feldschneider ¶ 6, Dkt. 22-4.  Those piloting drones during the attack could not "keep the GCS door closed," and "each shockwave rattled the GCS creating huge overpressure." Decl. of Shanerria Barber ¶ 3.

The attack on al-Asad caused numerous injuries.  Servicemembers reported perforated eardrums, cracked teeth, and bleeding eyes, among other things.  *See, e.g.*, Decl. of Anthony Panchoo ¶ 3, Dkt. 22-1; Decl. of Nicolaus Trivelpiece ¶ 6, Dkt. 22-3; Decl. of Jaron Schneider ¶ 10, Dkt. 22-2.  Many servicemembers—including all the plaintiffs in this case—were subsequently diagnosed with traumatic brain injuries. *See, e.g.*, Decl. of Toni Alexander ¶ 9; Decl. of Shanerria Barber ¶ 4; Decl. of Badekemi Biladjetan ¶ 4, Dkt. 22-1.  The traumatic brain injuries have caused tinnitus and migraines, *see* Decl. of Toni Alexander ¶ 9; chronic pain, *see* Decl. of Badekemi Biladjetan ¶ 8; and hearing loss, speech impairment, and nausea, among other conditions, Decl. of Jeremy Winkler ¶ 6, Dkt. 22-2.  "TBI sustained during combat operation significantly increases the risk for co-occurring condition[s] like PTSD" and depression, and one servicemember, Sergeant Jason Quitugua, developed post-traumatic stress disorder and mild depression after the attack.  Report of Heechin Chae at 2–3 ("Chae Report"), Dkt. 20-3.  In October 2021, twenty-one months after the attack, Sergeant Quitugua took his own life.  *See* Decl. of Kaedinn Quitugua ¶ 2, Dkt. 22-3.

U.S. servicemembers, employees, and contractors who incurred traumatic brain injuries in the al-Asad attack and their immediate family members brought this suit against Iran and the IRGC (together, "Iran").  *See* Compl. ¶ 10, Dkt. 1.  They sued under the FSIA's state-sponsor-of-terrorism exception and seek compensatory and punitive damages arising from injuries sustained during the attack and subsequent pain and suffering.  *See id.* at 60.  After the plaintiffs served Iran and Iran failed to respond within the allotted timeframe, the plaintiffs moved for entry of default.

*See* Mot. for Entry of Default at 1, Dkt. 17.  The Clerk of Court declared Iran in default, and the plaintiffs moved for default judgment.  *See* Mot. for Default J. at 1.

On October 19, 2023, the Court stayed the case pending the D.C. Circuit's decision in *Borochov v. Islamic Republic of Iran*, No. 22-7058, which presented the issue whether an attempted killing qualifies as an "extrajudicial killing" under the "state-sponsor-of-terrorism exception" of the FSIA.  The D.C. Circuit answered this question in the negative.  It held that a perpetrator does not commit an act of extrajudicial killing under the FSIA if he "did not kill anyone." *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1060 (D.C. Cir. 2024).  Further, a perpetrator does not provide "material support and resources for" an extrajudicial killing unless such a killing has occurred.  *Id.* at 1064.

Following the Circuit's decision, the plaintiffs argue that Sergeant Quitugua's "death by suicide" was "a completed, not attempted, act of extrajudicial killing."[3]  Pls.' Status Report at 2, Dkt. 21.  They also raised a new, alternative basis for jurisdiction: namely, that Iran's attacks on the al-Asad airbase and Erbil International Airport together constituted "aircraft sabotage" under 28 U.S.C. § 1605A(a).  *Id.*

## II.    LEGAL STANDARDS

Under the FSIA, a plaintiff can obtain a default judgment by "establish[ing] his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  "This standard mirrors . . . Federal Rule of Civil Procedure 55(d) governing default judgments against the U.S. government." *Owens v. Republic of Sudan* (*Owens I*), 864 F.3d 751, 785 (D.C. Cir. 2017).  Though

---

[3] In their initial brief, which was filed before the D.C. Circuit issued its decision in *Borochov*, the plaintiffs also argued that the "extrajudicial killing" was either Iran's attempted "killing" at the al-Asad airbase or Sergeant Quitugua's suicide in October 2021.  *See* Mot. for Default J. at 11.  The plaintiffs have since conceded their attempt argument and rely exclusively on the suicide as the basis for an "extrajudicial killing."  *See* Pls.' Status Report at 2.

this requirement "provides foreign sovereigns a special protection" before a court reaches default judgment, *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014), "neither Rule [55(d)] nor § 1608(e) relieves the sovereign from the duty to defend cases," *Com. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994) (internal citations omitted).   In fact, "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true." *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 42 (D.D.C. 2018); *see also Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 82 (D.D.C. 2006).   Default judgments under § 1608(e) may rely on the plaintiffs' affidavits and declarations.   *Owens I*, 864 F.3d at 788–89.   "[T]he Court must still determine that an exception to immunity applies and that the plaintiff has a sufficient legal and factual basis for [her] claims."   *Abedini v. Gov't of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 128 (D.D.C. 2019).

## III.   ANALYSIS

### A.   Foreign Sovereign Immunities Act

This Court has "original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity."   28 U.S.C. § 1330(a).   In other words, the Court has jurisdiction if (1) the plaintiff does not seek a jury trial; (2) the defendant is a foreign state; (3) the action is in personam; and (4) an exception to sovereign immunity applies.   The first three conditions are undoubtedly satisfied here.   First, the plaintiffs "do not seek a jury trial," *see* Mot. for Default J. at 8, and as "all federal appellate courts which have considered the issue . . . have held," "jury trials are not available in suits brought under the [FSIA]," *Universal Consol. Cos. v. Bank of China*, 35 F.3d 243, 245 (6th Cir. 1994).   *Accord Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 65 (D.D.C. 2010).   Second, Iran is a foreign state, and the

IRGC is an entity of the Iranian state.  Third, this action is in personam because the Court will exercise "personal jurisdiction over the defendants as legal persons, rather than property." *Valore*, 700 F. Supp. 2d at 65.

That leaves the fourth requirement: that an exception to sovereign immunity applies.  The FSIA, which codifies the common-law principle that sovereign entities are presumptively immune from suit, provides that "foreign state[s] shall be immune from the jurisdiction of the courts of the United States and the States" unless a statutorily enumerated exception applies.  28 U.S.C. § 1604; *see Doe v. Taliban*, 101 F.4th 1, 5 (D.C. Cir. 2024).  One such exception applies to acts by state sponsors of terrorism.  *See* 28 U.S.C. § 1605A(a)(1).  Under the "state-sponsor-of-terrorism exception," sovereign immunity is abrogated when, among other requirements not relevant here, "(1) 'money damages are sought,' (2) 'against a foreign state' for (3) 'personal injury or death' that (4) 'was caused' (5) 'by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act.'" *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 79 (D.D.C. 2010) (quoting 28 U.S.C. § 1605A(a)(1)).

The plaintiffs have satisfied the first three elements of this exception.  First, the plaintiffs seek money damages.  *See* Compl. at 60.  Second, the action and the Clerk of Court's entry of default are against Iran, a "foreign state," 28 U.S.C. § 1603(a), and the IRGC, which is "so closely bound up with the structure of the [Iranian] state" to "be considered as the foreign state itself," *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 59 (D.D.C. 2019) (cleaned up).  *See* Clerk's Entry of Default, Dkt. 18.  Third, the suit arises from "personal injury or death" incurred during and subsequent to Iran's January 2020 attack.  *See* Compl. ¶¶ 382–394.

But the plaintiffs have failed to satisfy the final two requirements of the exception.  They have not demonstrated that a predicate act—*i.e.*, an "act of torture, extrajudicial killing, aircraft

sabotage, [or] hostage taking"—"caused" their alleged harms.  28 U.S.C. § 1605A(a)(1).  More specifically, as discussed below, they have not shown that Iran's attack on January 8, 2020 constituted either an "extrajudicial killing" or "aircraft sabotage."  As such, the terrorism exception does not apply, and the Court lacks subject-matter jurisdiction.

### B.    Extrajudicial Killing

28 U.S.C. § 1605A withdraws immunity for a foreign state's "act of . . . extrajudicial killing."  *Borochov*[4] forecloses relief based on attempted killings, so the only question before the Court is whether Sergeant Quitugua's suicide qualifies as an "extrajudicial killing."  Based on the FSIA's plain text and background principles of immunity, it does not.

Starting with the text, the FSIA gives the term "extrajudicial killing" "the [same] meaning" as "in section 3 of the Torture Victim Protection Act of 1991."  28 U.S.C. § 1605A(h)(7).  That statute in turn defines "extrajudicial killing" as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized people."  *Id.* § 1350 note.  The ordinary meaning of a "killing" is an act "[t]o end life."  *Kill*, Black's Law Dictionary (10th ed. 2014); *see Killing*, The Oxford English Dictionary (2023) ("That kills or deprives of life."); *Kill*, Merriam-Webster's Collegiate Dictionary 642 (10th ed. 1993) ("[T]o deprive of life.").  And the word "deliberated" means "carefully considered," *Deliberated*, Oxford English Dictionary (2023), or "[i]ntentional;

---

[4] The plaintiffs request that "these proceedings be stayed until the *Borochov* plaintiffs have exhausted all appellate process."  Status Report at 3.  The D.C. Circuit issued the mandate in *Borochov* on May 3, 2024.  *See* Mandate, *Borochov v. Islamic Republic of Iran*, No. 22-7058 (D.C. Cir. May 3, 2024).  Although the *Borochov* plaintiffs have not, to the Court's knowledge, petitioned for a writ of certiorari, the Court will not exercise its "broad discretion to stay a case pending the outcome of proceedings in another forum."  *Garcia v. Acosta*, 393 F. Supp. 3d 93, 110 (D.D.C. 2019); *cf. Pietersen v. U.S. Dep't of State*, No. 22-cv-3544, 2024 WL 1239706, at *9 (D.D.C. Mar. 21, 2024).  And in any event, the Court is "obligated to follow controlling circuit precedent."  *United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997).

premediated; fully considered," *Deliberate*, Black's Law Dictionary (10th ed. 2014). To simplify, an extrajudicial killing under the FSIA occurs when a foreign state, without judicial authorization, intentionally ends a human life. As the D.C. Circuit put it, "the plain meaning of the statutory text" is that "[t]he word 'killing' refers to an action resulting in the death of another." *Borochov*, 94 F.4th at 1061.

Further, the principle of *noscitur a sociis*—"a word is known by the company it keeps"—supports the interpretation that the foreign state must be the direct cause of another person's death. *United States v. Yates*, 574 U.S. 528, 543 (2015). Under the *noscitur* canon, to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words," a court will "cabin the contextual meaning of that term" based on its "immediately surrounding" neighboring terms. *Id.* Here, "extrajudicial killing" appears in a list of acts—*i.e.*, "torture, extrajudicial killing, aircraft sabotage, hostage taking." 28 U.S.C. § 1605A(a)(1). The neighboring terms all require a perpetrator to act directly on an object or against another person in a harmful manner. "Torture" requires "any act, directed against an individual in the offender's custody or physical control," 28 U.S.C. § 1350 note; "aircraft sabotage" includes "an act of violence against a person on board an aircraft in flight if that act is likely to endanger the safety of that aircraft" or destruction of "an aircraft in service," Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation art. 1, § 1, Sept. 23, 1971, 974 U.N.T.S. 177, 178; and "hostage taking" occurs when "[a]ny person who seizes or detains and threatens to kill, to injure or to continue to detain another person . . . in order to compel a third party . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage," International Convention Against the Taking of Hostages art. 1, § 1, Dec. 17, 1979, 1316 U.N.T.S. 205, 207. An "extrajudicial killing" is thus best

understood in this narrower sense: namely, a foreign state must, without authorization, take an action against another person that directly causes his death.

In general, death by suicide does not fall under this definition.  Suicide is "a voluntary, intentional self-destruction" by the victim's own hand.  *Dent v. Va. Mut. Benefit Life Ins. Co.*, 226 A.2d 166, 167 (D.C. 1967).  It is a volitional "taking [of] one's own life," *Suicide*, Black's Law Dictionary (10th ed. 2014), and usually is a conscious choice to "put[] an end to [one's] own existence," 4 William Blackstone, Commentaries *189.  In tort law, "[t]he act of suicide generally is considered to be a deliberate, intentional, and intervening act which precludes a finding that a given defendant is, in fact, responsible for the decedent's death."  *District of Columbia v. Peters*, 527 A.2d 1269, 1275 (D.C. 1987).  As such, one usually cannot recover in negligence for the suicide of another.  In the prototypical case, a suicide will not qualify as an "extrajudicial killing" under the FSIA because it is an "intervening act" breaking the direct link between a foreign state's act and the decedent's death.

That said, the Court's definition does not foreclose suicide from qualifying as an "extrajudicial killing" in a rare circumstance.  If, for example, a foreign state intentionally compels a suicide, the decedent's death might qualify as an "extrajudicial killing."  A variation on the facts of *Kar v. Islamic Republic of Iran* provides an illustrative example.  In that case, Siamak Pourzand, an Iranian journalist and critic of the regime, was arrested and held in detention.  *Kar v. Islamic Republic of Iran*, No. 19-cv-2070, 2022 WL 4598671, at *2 (D.D.C. Sept. 30, 2022).  After international pressure, Iran released Siamak to home detention but kept him under "constant surveillance."  *Id.* at *3.  Due to his conditions of confinement, Siamak's mental health suffered severely, and he eventually "committed suicide by jumping off his balcony."  *Id.*  Judge Bates concluded that Iran's treatment of Siamak amounted to "hostage taking" and "torture" but not an

"extrajudicial killing." *Id.* at *7–15.  He reasoned that the plaintiffs provided insufficient "evidence to conclude that Iran imposed conditions of confinement on Siamak with the intention of *forcing* him to commit suicide." *Id.* at *15 (emphasis added).  Had the *Kar* plaintiffs cleared that evidentiary threshold, however, one could conclude that Iran intentionally acted to create conditions of confinement that coerced Siamak into taking his own life.  *See id.* at *15 n.14 ("The Court need not, and does not, conclude that a suicide can never constitute an extrajudicial killing to conclude that the suicide in this case cannot be considered an extrajudicial killing.").  This incorporation of suicide into "extrajudicial killing" is, of course, a narrow exception because most suicides are volitional acts of a decedent that break the causal chain between a foreign state's act and a decedent's death.  *See Peters*, 527 A.2d at 1275.

This exception is consistent with background principles of tort and criminal law.  Suicide is usually an intervening break in the causal chain, but an "important exception" arises in tort when a defendant's conduct "produces an abnormal mental condition which results in an uncontrollable impulse to commit suicide."[5]  *Id.* at 1275–76; *see Wash. Metro. Area Transit Auth. v. Johnson*, 726 A.2d 172, 177 n.8 (D.C. 1999).  A similar principle appears in the criminal law.  Although "[t]he common law recognized suicide as a felony," Model Penal Code § 210.5 cmt. 1 (Am. L. Inst. 1980), courts have recognized that an individual may be criminally liable for homicide if he

---

[5] The plaintiffs encourage the Court to adopt the test adopted in *Kimberlin v. DeLong*, 637 N.E.2d 121, 126–28 (Ind. 1994).  In that case, the Indiana Supreme Court held that "an action may be maintained for death or injury from suicide or suicide attempt where a defendant's willful tortious conduct was intended to cause a victim physical harm and where the intentional tort is a substantial factor in bringing about the suicide." *Id.* at 128.  Applying this rule, it held that plaintiffs could recover for a suicide "occurring more than four years after [an] explosion" caused by defendant. *Id.*  To the Court's knowledge, few, if any, other courts have adopted this test, and the Court will not apply it here.

"engaged in the commission of a felony . . . and inflicts upon his victim both physical and mental injuries, the natural and probable result of which would render the deceased mentally irresponsible and suicide followed."  *Stephenson v. State*, 179 N.E. 633, 649 (Ind. 1932); *see United States v. Hamilton*, 182 F. Supp. 548, 551 (D.D.C. 1960) (same).  The Model Penal Code has also advised that a "person may be convicted of criminal homicide for causing another to commit suicide only if he purposely causes such suicide by force, duress or deception."  Model Penal Code § 210.5(1). Criminal penalties are thus appropriate only "where the actor actively participates in inducing the suicide of another."  *Id.* cmt. 4.  From these tort- and criminal-law analogues, the Court gleans a similar principle: a defendant is liable for an act that creates conditions inexorably leading to suicide.

That is not the case here.  To start, the weight of the evidence suggests that Iran did not intend to compel or induce Sergeant Quitugua's suicide.  Rather, it fired eleven 3,000-pound missiles at the Al-Asad airbase, likely intending death from the missiles themselves.  *See* Decl. of Thomas Feldschneider ¶ 3; Decl. of Jonathan Stark ¶ 2, Dkt. 22-3.  The missile attack left servicemembers "worried that [they] would die."  Decl. of Jonathan Stark ¶ 2.  In the immediate aftermath of the attack, "IRGC Aerospace Force [C]ommander General Amir Ali Hajizadeh" bragged that "'many' American soldiers were killed by Iran's missiles."  Greenway Report ¶ 64. The Commander was (fortunately) incorrect, but his statement further supports the inference that Iran's goal was to kill or seriously injure Americans directly.  The plaintiffs have not shown that Iran fired missiles with the "deliberated" intention of servicemembers taking their own lives.

Nor have the plaintiffs presented any evidence that the intentional missile barrage carried a natural and foreseeable effect of inducing a traumatic brain injury that led to suicide.  *See Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 159 (D.D.C. 2019) ("[A] plaintiff must prove that

the consequences of the foreign state's conduct were reasonably certain (i.e., more likely than not) to occur." (cleaned up)); *cf.* Model Penal Code § 210.5 cmt. 4 ("Criminal liability is limited to purposeful conduct on the ground that merely creating the risk that another will commit suicide would cast the net of liability too wide."). Sergeant Quitugua's suicide was temporally attenuated from the al-Asad attack; his death occurred in October 2021—over a year and a half after the attack. Decl. of Kaedinn Quitugua ¶ 2; *cf. Craig v. District of Columbia*, 881 F. Supp. 2d 26, 35 (D.D.C. 2012) ("[T]he passage of time weakens or destroys the causal inference."). In addition, a twenty-one-month gap is somewhat at odds with *Borochov*, which held that an "extrajudicial killing" requires a completed killing. 94 F.4th at 1061. It is difficult to say here that Iran's attack on January 8, 2020 did not end until October 2021 when Sergeant Quitugua's death occurred. Indeed, on the day of the al-Asad attack, Iran's Foreign Minister Mohammad Javad Zarif stated, "the strikes *concluded* Tehran's response" to the death of Soleimani. Greenway Report at 11 (cleaned up).

Dr. Heechin Chae's[6] medical report highlights additional factors that could have contributed to Sergeant Quitugua's suicide. Through no fault of his own, Sergeant Quitugua was thrust back into service following the attack, "return[ing] to duty including flight operations." Chae Report at 2. In Dr. Chae's view, Sergeant Quitugua "returned to duty too soon without follow up and clearance by a psychologist" and was forced to "work longer and more intense hours to cover the shortage of personnel due to many fellow servicemembers being medically evaluated

---

[6] Dr. Chae, M.D., has twenty-three years of medical practice and "board certifications in Physical Medicine & Rehabilitation, in Brain Injury Medicine, and in Pain Medicine." Chae Report at 1. His "professional experience includes over 10 years as the Director of Traumatic Brain Injury Department/Intrepid Spirit Center" at Fort Belvoir Community Hospital from 2011 to 2022. *Id.* He also has treated over 8,000 servicemembers who "sustained or suspected to sustain TBI during combat or while in training." *Id.*

due to injuries." *Id.* Such "brain exposure to long hours of intense operation . . . is contraindicated for patients who just sustained TBI" and is also associated with "high incidence of long term/permanent symptoms including headache, cognitive impairment, sensory integration disorder, depression/anxiety, PTSD, and other psychological conditions." *Id.* Based on Dr. Chae's expertise, it is reasonable to conclude that Sergeant Quitugua's necessary but immediate return to service could have exacerbated his traumatic brain injury in a manner deleterious to his mental health. *Cf. Durphy v. Kaiser Found. Health Plan*, 698 A.2d 459, 467 (D.C. 1997) ("In medical malpractice cases . . . contributory negligence is a valid defense if the patient's negligent act concurs with that of the physician and creates an unreasonable risk of improper medical treatment." (cleaned up)).

The Court recognizes that Dr. Chae opined that "suicide was a foreseeable result of th[e] attack," Chae Report at 3, but this is not dispositive. For one, the plaintiffs have not shown that other factors mentioned in Dr. Chae's report did not contribute to Sergeant Quitugua's death. *See Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 127 (D.C. Cir. 2012) ("The plaintiff must prove, as a result of the defendant's action, the decedent could not have decided against and refrained from killing himself." (cleaned up)). For another, mere foreseeability is not sufficient in the sovereign-immunity context. To be sure, the al-Asad attack was, at the very least, a "but for" cause contributing to Sergeant Quitugua's death. But D.C. Circuit authority requires the Court to "narrowly construe[]" "[e]xplicit waivers of sovereign immunity . . . in favor of the sovereign" and "not enlarge[]" waivers "beyond what the statutory language requires." *Borochov*, 94 F.4th at 1062 (cleaned up). On the Court's reading of the FSIA, an "extrajudicial killing" requires a more direct causal link—above and beyond "but for" cause—between a foreign state's act and a resulting death. In a rare case, it is possible that a suicide could qualify under this construction as

"uncontrollable impulse" or "induced" death, but Sergeant Quitugua's does not.  As such, Sergeant Quitugua's suicide cannot serve as a basis for jurisdiction under the FSIA.[7]

### C.    Aircraft Sabotage

Following the D.C. Circuit's *Borochov* decision, the plaintiffs present an alternative basis for jurisdiction under the FSIA.  They contend that Iran's successful firing of eleven ballistic missiles at the al-Asad airbase and one missile at Erbil International Airport qualify as "act[s] of . . . aircraft sabotage" under 28 U.S.C. § 1605A(a)(1).  *See* Pls.' Suppl. Mem. at 3.  The Court disagrees.

In the FSIA, Congress gave "the term 'aircraft sabotage' . . . the meaning given [to] that term in Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation."  28 U.S.C. § 1605A(h)(1).  Article 1 of the Convention defines "aircraft sabotage" as follows:

1.    Any person commits an offence if he unlawfully and intentionally
    (a)    performs an act of violence against a person on board an aircraft in flight if that act is likely to endanger the safety of that aircraft; or
    (b)    destroys an aircraft in service or causes damage to such an aircraft which renders it incapable of flight or which is likely to endanger its safety in flight; or
    (c)    places or causes to be placed on an aircraft in service, by any means whatsoever, a device or substance which is likely to destroy that aircraft, or to cause damage to it which renders it incapable of flight, or to cause damage to it which is likely to endanger its safety in flight; or
    (d)    destroys or damages air navigation facilities or interferes with their operation, if any such act is likely to endanger the safety of aircraft in flight; or
    (e)    communicates information which he knows to be false, thereby endangering the safety of an aircraft in flight.

---

[7] Moreover, the FSIA's "extrajudicial killing" exception, 28 U.C.C. § 1605A(a)(1), "require[s] . . . a showing of proximate cause."  *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (cleaned up).  And only "a completed killing" counts as an "extrajudicial killing."  *Borochov*, 94 F.4th at 1061.  Sergeant Quitugua's "killing" was not "complete" until October 2021, well after most of the plaintiffs' injuries arose.

> 2.  Any person also commits an offence if he:
>     (a)  attempts to commit any of the offences mentioned in paragraph 1 of this Article; or
>     (b)  is an accomplice of a person who commits or attempts to commit any such offence.

Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation ("Convention") art. 1, *supra*, 974 U.N.T.S. at 178–79.  Article 4 of the same Convention provides that the treaty "shall not apply to aircraft used in military, customs or police services." *Id.* art. 4, § 1.  As its very name suggests, the Convention does not cover the sabotage of noncivilian military aircrafts or military personnel. *See Strange v. Islamic Republic of Iran*, No. 14-cv-435, 2016 WL 10770678, at *6 n.2 (D.D.C. May 6, 2016) ("'[A]ircraft sabotage' as defined in the FSIA actually only pertains to civilian aircraft.").  As such, the attacks on the bases at al-Asad and Erbil International Airport cannot qualify as acts of "aircraft sabotage."

The plaintiffs resist this conclusion.  They argue that the FSIA exclusively incorporated Article 1 of the Convention but made no mention of incorporating other provisions like Article 4, which limits the Convention to civil aviation.  In their view, "[i]f the drafters of the Convention had intended to alter the definition of aircraft sabotage" in Article 1, "they would have included the limitations of Article 4 § 1 in that definition." Pls.' Suppl. Mem. at 5.  In other words, Article 4's exclusion of military services reflects a limitation on "the obligations of the treat[y] states" under the Convention, not a limitation on Article 1's definition of "aircraft sabotage" as incorporated into the FSIA. *Id.*

But typically, when "Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it." *George v. McDonough*, 596 U.S. 740, 746 (2022) (cleaned up).  Here, Congress was explicit that an "aircraft sabotage" "has the meaning given that term in Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of

Civil Aviation."  28 U.S.C. § 1605A(h)(1).  And the "meaning given" to "aircraft sabotage" in Article 1 is plainly limited by Article 4.  Besides excluding military aviation from the Convention's scope, Article 4 also limits Article 1's definition of "aircraft sabotage" based on, among other things, the location of an aircraft's take-off or landing and the categories of damaged air-navigation facilities.  *See, e.g.*, Convention art. 4, § 2.  Interpreting Article 1 of the Convention unconstrained from the limitations set forth in the rest of the Convention would bring only some clumps of "the old soil" to the FSIA while inexplicably leaving others behind.  *George*, 596 U.S. at 746.  It would also be odd to ignore Article 4's focus on civil aviation when Congress acknowledged that it was incorporating a definition of "aircraft sabotage" from a Convention on "*Civil* Aviation."  28 U.S.C. § 1605A(h)(1) (emphasis added).  And given that the FSIA's grant of sovereign immunity is "[s]ubject to existing international agreements to which the United States is a party," the Court is hesitant to read out from the FSIA an important limitation from one such treaty.  28 U.S.C. § 1604; *see Borochov*, 94 F.4th at 1062 ("The courts . . . should not open the door to litigation against foreign governments that the Political Branches have not clearly authorized.").

Far from showing that Iran intended to hit civilian targets on January 8, 2020, the overwhelming evidence shows that Iran targeted military aircrafts and personnel.  Al-Asad airbase was a military base "host[ing] American and coalition troops."  Press Brief at 2.  Any damaged aircrafts or facilities or injured individuals were involved "in military . . . services."  Convention art. 4, § 1.  Indeed, the day after the strike, an Iranian commander lauded Iran's strike on "one of the United States' most important bases."  Greenway Report at 11.

Moreover, Erbil International Airport also served, at least in part, as a military base.  *See id.* at 10 (describing Erbil as one of "two bases" Iran attacked).  And Iranian and American military leaders alike described it as such.  *See id.* at 11 (noting IRGC Aerospace Force Commander

General Amir Ali Hajizadeh claimed that Iran's "ballistic missile strikes on the al-Asad and Erbil bases . . . were aimed at damaging the American 'military machine' and not inflicting US casualties"); Press Brief at 2 (Secretary of Defense Mark Esper characterizing "Irbil" as one of "two Iraqi bases" Iran targeted).  Against this evidence, the plaintiffs provide scant support for their assertion that Iran attempted or committed actual harm to civilians, civilian aircrafts, or civil-aviation facilities at Erbil Airport.  Instead, in a footnote, they note that "[i]n late 2019 to early 2020, Erbil International Airport hosted civilian aircraft travelling internationally to and from Istanbul, Doja, Cairo, Damascus, Beirut, Aleppo, Dubai, Cologne, and Frankfurt, among other locations." Pls.' Suppl. Mem. at 5 n.2.  But this representation, standing alone, does not provide sufficient evidence of Iran's intent to damage or success in damaging civil aviation at the Erbil Airport, as the FSIA requires.

Further, even if the plaintiffs could prove with additional investigation that Iran committed an act of "aircraft sabotage" at Erbil Airport, *see* Status Report at 2, they cannot show that "injur[ies]" from the al-Asad attack were "caused by" that act of sabotage at Erbil Airport.  28 U.S.C. § 1605A(a)(1).  It is unimaginable that the missiles launched at Erbil Airport were a "substantial factor" in the injuries the plaintiffs sustained 253 miles away at al-Asad airbase.  *See Richard v. Bell Atl. Corp.*, 209 F. Supp. 2d 23, 27 n.2 (D.D.C. 2002) ("The Court has the authority to take judicial notice of . . . the distance between two locations.").  For this reason, the Court denies the plaintiffs' request for additional time to supplement the record.

Opposing this conclusion, the plaintiffs invoke *Van Beneden v. Al-Sanusi*, 709 F.3d 1165 (D.C. Cir. 2013).  In their view, the Court must consider "the totality of [Iran's] violence in a single day," *id.* at 1168, rather than treat Iran's attacks on al-Asad and Erbil as separate "acts" for purposes of § 1605A(a)(1), *see* Pls.' Suppl. Mem. at 6.  But *Van Beneden* is inapposite because it

addressed the FSIA's "act or incident" relation-back requirements, not the meaning of the term "act" in the state-sponsor-of-terrorism exception.  *See* 709 F.3d at 1168.  Moreover, *Van Beneden* relied, at least in part, on the distinction between an "incident"—"refer[ring] to the totality of that terrorist's violence in a single day"—and an "act"—"refer[ring] to a single terrorist pulling the trigger a single time."  *Id.*  Although both "act" and "incident" appear in the FSIA's relation-back requirements, only the word "act" appears in the state-sponsor-of-terrorism exception.  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012) ("The expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*).").  From this, the Court draws a negative inference that the FSIA contains a waiver of immunity for discrete "acts" of terrorism though not necessarily sprawling "incidents."  This inference is consistent with the D.C. Circuit's guidance that "ambiguities in [the FSIA's] statute of limitations" may be interpreted "flexibly and capaciously" but "[e]xplicit waivers of sovereign immunity are narrowly construed in favor of the sovereign and are not enlarged beyond what the statutory language requires."  *Borochov*, 94 F.4th at 1062 (cleaned up).  Indeed, the D.C. Circuit has "never interpreted the FSIA's jurisdictional requirements so flexibly."  *Id.* at 1065.

*   *   *

By its plain terms, the FSIA contains a clear gap in the recovery it affords.  The Act allows survivors of hostage takings, aircraft hijackings, and torture to recover for their injuries.  But it does not allow survivors of attacks like those here to recover for their injuries *unless* a death has occurred.  As a result, the plaintiffs—victims of Iran's January 8, 2020 near-deadly attack on Iraq's al-Asad airbase—cannot recover damages for serious injuries they sustained while honorably and bravely engaged in military service to our country.  The Court is deeply sympathetic to the plight of the victims, but it must apply the FSIA as written.

**CONCLUSION**

For the foregoing reasons, Iran's January 8, 2020 attack does not qualify as an act of "extrajudicial killing" nor "aircraft sabotage" under the state-sponsor-of-terrorism exception of the FSIA. Iran is thus immune from suit, and the Court lacks jurisdiction. Accordingly, the Court will deny the Motion for Default Judgment, Dkt. 20, and dismiss this action. A separate order consistent with this decision accompanies this memorandum opinion.

                                        DABNEY L. FRIEDRICH
                                       United States District Judge

June 17, 2024